

CHRISTOPHER EZEH,

              Plaintiff,

v.

ROBERT WILKIE,[1] *Secretary of the Department of Veterans Affairs*,

              Defendant.

**DECISION AND ORDER**

6:13-CV-6563 EAW

## INTRODUCTION

*Pro se* plaintiff Christopher Ezeh ("Plaintiff"), a former employee of the Department of Veterans Affairs (the "VA"), commenced this employment discrimination action in October 2013. (Dkt. 1). Currently pending before the Court are the parties' competing motions for summary judgment. (Dkt. 183; Dkt. 189). For the reasons set forth below, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Factual Background

Plaintiff is a naturalized citizen of the United States of America who was born in Nigeria and is Roman Catholic. (Dkt. 195 at 14). In March 2011, Plaintiff was hired by the VA Medical Center in Canandaigua, New York (the "Canandaigua VA") as a part-time Catholic chaplain. (*Id.* at 15-16; Dkt. 189-4 at 2, 11).

---

[1]    Defendant Robert Wilkie has been substituted pursuant to Fed. R. Civ. P. 25(d).

## A.    Payroll Issues and Denial of Request for Waiver

Melody Christensen ("Christensen"), a civilian payroll technician at the Canandaigua VA, testified[2] that as a part-time chaplain, Plaintiff was required to sign in on a time sheet. (Dkt. 189-7 at 16). Christensen testified that this was standard procedure for all part-time chaplains. (*Id.*). Similarly, Dawn Crane, an administrative assistant at the Canandaigua VA, has stated in a sworn affirmation that all part-time chaplains are required to utilize sign-in sheets. (*Id.* at 25). Defendant has submitted copies of time sheets showing sign-in information for multiple part-time chaplains, including Plaintiff (Dkt. 189-4 at 75-76), and has identified at least five other part-time chaplains, including Robert Searle ("Searle"), who were required to track their hours on sign-in sheets (Dkt. 189-7 at 132, 174).

Christensen further testified that when Plaintiff was initially hired, an error was made by an unknown employee of the Canandaigua VA, and Plaintiff was incorrectly recorded as a full-time employee in the payroll system. (*Id.* at 17). As a result of this error, Plaintiff was underpaying for his health insurance, because full-time employees receive a greater

---

[2]    Christensen and several other Canandaigua VA employees provided sworn testimony in connection with Plaintiff's complaints to Geraldine Clark, an Equal Employment Office Investigator with the Department of Veterans Affairs Office of Resolution Management. The information set forth in this sworn testimony could be presented in an admissible form at trial, and it is therefore proper for the Court to consider it on the instant motions for summary judgment. *See U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, No. 98 CIV. 8168 (MBM), 2001 WL 521809, at *2 n.1 (S.D.N.Y. May 16, 2001) (certified transcripts of sworn testimony from another proceeding are admissible on a motion for summary judgment because they have "the same evidentiary value and safeguards as affidavits provided for in Rule 56(e)" (quoting *Shulins v. New England Ins. Co.*, 360 F.2d 781, 785 (2d Cir. 1966))).

benefit with respect to their health insurance premiums. (*Id.*). Plaintiff's federal tax exemptions were also incorrectly recorded at the time of hire, which resulted in an underpayment of federal tax withholding. (*Id.* at 18). A third payroll error resulted in Plaintiff receiving an overpayment in 2011—a timekeeper at the Canandaigua VA had incorrectly paid Plaintiff for his lunch break and/or incorrectly recorded him as working eight hours when he actually worked four hours. (*Id.* at 20). These payroll errors continued through December 2011, resulting in a significant overpayment to Plaintiff. (Dkt. 189-4 at 81).

In March 2012, Penny Dawson ("Dawson"), an accountant at the Canandaigua VA, submitted to the VA's Committee on Waivers and Compromises (the "Waiver Committee") a Referral on Indebtedness requesting that Plaintiff's overpayment be waived. (*Id.* at 78-81). Christensen assisted with preparing the form and also submitted an email to the Waiver Committee explaining the situation. (*Id.*). Christensen had no knowledge of Plaintiff's religion or national origin. (Dkt. 189-7 at 16). Nothing in the Referral on Indebtedness submitted to the Waiver Committee notes Plaintiff's national origin, or religion. (Dkt. 189-4 at 78-81).

On May 3, 2012, the Waiver Committee denied the request that Plaintiff's overpayment be waived. (*Id.* at 83-84). The Waiver Committee explained that it did not find that Plaintiff was at fault and that the overpayment was the result of administrative error. (*Id.* at 84). However, the Waiver Committee found that it was Plaintiff's obligation to review his earnings statements for accuracy and that he had not done so. (*Id.*). Accordingly, the Waiver Committee concluded that it would be "against equity and good

conscience and not in the best interest of the government" to waive Plaintiff's indebtedness. (*Id.*).

## B.    Plaintiff's Employment at the Canandaigua VA

Shortly after Plaintiff started at the Canandaigua VA, protestant chaplain Pamula Royal ("Royal") reported an incident in which she asked for Plaintiff's assistance in covering an invocation and benediction, and Plaintiff yelled at her that she was not his boss and could not tell him what to do. (Dkt. 189-7 at 159-60).[3]

In July 2011, Plaintiff was informed that he could not use VA letterhead for personal correspondence. (Dkt. 189-4 at 19). Plaintiff also used the Canandaigua VA's address to send copies of a book he authored to officials, including the Vice-President of the United States (*id.* at 15, 17), and placed his personal website in his VA signature block (*id.* at 21). In November 2011, Plaintiff received a performance evaluation in which he was rated "fully successful," where the choices were outstanding, excellent, fully successful, minimally satisfactory, and unsatisfactory. (*Id.* at 86-96).

In January 2012, Searle was promoted to supervisory chaplain at the Canandaigua VA and became Plaintiff's direct supervisor. (Dkt. 195 at 16). Patricia Lind ("Lind"), the

---

[3]    The Court discusses various complaints made against Plaintiff in its assessment of this case. To be clear, the Court does not treat these complaints as true. Instead, the Court has noted their existence in order to provide the necessary context in which various decisions about Plaintiff's VA employment were made. *See Lane v. Sotheby Parke Bernet, Inc.*, 758 F.2d 71, 72 (2d Cir. 1985) (considering the fact that there had been "complaints about numerous problems people were having with [the plaintiff]" in determining whether a *prima facie* discrimination case existed).

Associate Director of Patient/Nursing Services at the Canandaigua VA, oversaw the chaplain service and was Searle's direct supervisor after January 29, 2012. (*Id.*).

In March 2012, Father Martin Smith-Soucier ("Smith-Soucier"), who served as a full-time Catholic chaplain at the Canandaigua VA, was reassigned to a VA facility in Ohio. (*Id.* at 17). The parties dispute what happened next. Defendant maintains that Searle asked Plaintiff if he would work additional hours while a full-time replacement for Smith-Soucier was sought (Dkt. 189-7 at 173-74), while Plaintiff contends that he was made a full-time employee (Dkt. 195 at 17). In support of this contention, Plaintiff points to an email that he authored on March 28, 2012, in which he set forth his understanding of the duties he would be taking on in Smith-Soucier's absence. (Dkt. 94-1 at 4-8). However, nothing in this email states that Plaintiff is going to become a full-time employee, as opposed to temporarily handling Smith-Soucier's duties. To the contrary, Plaintiff states in the email that Searle had asked him "temporarily to add [Smith-Soucier's] Thursday, Saturday and Sunday duty hours to [his] duty hours." (*Id.* at 8). In other words, Plaintiff's own documentation contradicts his claim that he was made a permanent, full-time employee when Smith-Soucier left in March 2012. There is no documentation in the record to support the claim that Plaintiff became a full-time employee in March 2012.

Donna Crouse ("Crouse"), who was the Canandaigua VA's Human Resources Manager during the relevant time period, testified that pursuant to VA policy, Smith-Soucier's position could not simply be filled by Plaintiff. (Dkt. 189-7 at 35). Lind further explained that before the position could be filled, she first had to get permission from the VA's resource board to hire a full-time chaplain and that the position then had to be posted.

- 5 -

(*Id.* at 135). Christensen also testified that Plaintiff was never made a full-time employee, but instead agreed to work extra hours to provide additional coverage. (*Id.* at 17).

In early April 2012, Plaintiff reported to Searle and Lind an incident with a VA volunteer named Ed Moeller ("Moeller") in which Moeller allegedly stated that he hated Plaintiff, hated Plaintiff's accent, and hated the way Plaintiff talked, and that he was going to try to have Plaintiff fired. (Dkt. 189-4 at 99). This incident was investigated by Searle and Lind, and Searle met with the head of volunteer services to discuss the matter. (Dkt. 189-7 at 136, 180). Searle also met directly with Moeller and told him that he was not permitted to treat Plaintiff in any kind of a negative fashion. (*Id.* at 179). Edmund Flick, a Supervisory Human Resources Specialist at the Canandaigua VA, gave sworn testimony stating that Searle had consulted with him about the proper manner in which to handle Plaintiff's complaint regarding Moeller and that Searle had handled the matter appropriately. (*Id.* at 104). Contemporaneous email records show that Searle informed Plaintiff on April 10, 2012, that he spoken to Moeller and that the situation had been resolved. (Dkt. 189-4 at 98).

Royal reported another incident with Plaintiff on April 8, 2012, in which she locked her keys inside her office and Plaintiff refused to unlock the door and allow her inside, forcing her to call the Canandaigua VA Fire Department for assistance. (Dkt. 189-4 at 23; Dkt. 189-7 at 160). Royal also made a written complaint in which she reported that Plaintiff had forced a veteran to take communion after the veteran "clearly stated that he didn't feel well and did not want Communion that day." (Dkt. 189-4 at 29).

- 6 -

Also in April 2012, Searle received complaints from VA Chaplain Service volunteers that Plaintiff was trying to collect their keys. (*Id.* at 25). In a written memorandum, Searle noted that he had spoken to Plaintiff to ask him about the key situation and that Plaintiff claimed that Smith-Soucier had told him to collect the keys. (*Id.*). However, Searle contacted Smith-Soucier, who denied having given Plaintiff any such instruction. (*Id.*). In an email dated May 14, 2012, Smith-Soucier confirmed that he had not told Plaintiff to collect the keys and further stated that he had "found that you cannot rely upon [Plaintiff] to be truthful." (Dkt. 189-4 at 27).

On April 29, 2012, VA nurse Shannon Cicero ("Nurse Cicero") made a written complaint to Searle in which she stated that Plaintiff had become angry with VA staff and insisted that Catholic veterans only be taken to Catholic mass, even if they requested to attend protestant services. (*Id.* at 31). Nurse Cicero stated that "[t]he staff is not treated with respect or common courtesy by [Plaintiff]." (*Id.*). In the same time frame, Searle was informed by many longtime volunteers that they did not want to work with Plaintiff because he was rude and condescending. (Dkt. 189-7 at 182).

Also at some point in April 2012, Searle met with Father Condon of the Rochester Catholic diocese, to discuss Plaintiff's performance during his former employment with the diocese. (*Id.* at 186). Father Condon told Searle that Plaintiff had performance issues while employed by the diocese. (*Id.*).

On May 3, 2012, Searle met with Plaintiff to review Plaintiff's responsibilities. (Dkt. 189-4 at 33). Searle's written report of the meeting indicates that he told Plaintiff he had received some "concerns" about Plaintiff and that Plaintiff became "very angry and

insubordinate," and refused to attend a scheduled meeting with the union steward the following day. (*Id.*). Later that day, Searle sent an email to Plaintiff reiterating that a meeting had been scheduled for May 4, 2012, at 1:00 p.m., to discuss concerns that had been presented to him regarding Plaintiff, and informing Plaintiff that Plaintiff could choose whether to have a union steward present. (*Id.* at 35). Searle's scheduling of the May 4th meeting was consistent with the VA's standard procedure for handling complaints against staff. (Dkt. 189-7 at 105-06). Plaintiff sent an email to Searle at 8:28 a.m. on May 4, 2012, in which he stated that he would not be attending the May 4th meeting because he did not believe he'd been afforded enough time to consult with the union. (Dkt. 189-4 at 35). Plaintiff was given written notice from Searle and Crouse, among others, that he was required to attend the meeting. (*Id.* at 37).

Cathern Boylan ("Boylan"), who was then the acting Chief Nurse at the Canandaigua VA, would sometimes fill in for Lind as supervisor of the chaplains in Lind's absence. (Dkt. 189-7 at 11). Lind asked Boylan to attend the May 4th meeting in her place. (*Id.*). When Plaintiff did not appear at the May 4th meeting, Boylan sought out Plaintiff to ask if they could reschedule for later in the day. (*Id.*). In a memorandum dated May 7, 2012, Boylan recorded that Plaintiff became loud and angry when she spoke with him and that she therefore ended the exchange. (Dkt. 189-4 at 106).

On May 4, 2012, a posting was made on USAJobs for a full-time Roman Catholic Staff Chaplain at the Canandaigua VA. (*Id.* at 39). Plaintiff applied for this position and was deemed qualified, but it was ultimately decided that the pool of applicants was too small and that the VA would continue to recruit for the position. (Dkt. 189-7 at 116).

On May 6, 2012, Plaintiff made a second complaint against Moeller, claiming that Moeller had grabbed Plaintiff's arm while Plaintiff was attempting to move a veteran in a wheelchair. (*Id.* at 187). This complaint was fully investigated, including being referred to the VA's disruptive behavior committee, and Plaintiff's claim was ultimately determined to be unfounded. (*Id.* at 187-88). In an interview with clinical neuropsychologist Claudiu Dumitrescu ("Dumitrescu"), a member of the disruptive behavior committee, Plaintiff became agitated to the point that he shouted at Dumitrescu and slapped the desk. (Dkt. 189-4 at 60). Plaintiff and Moeller were separated from working together as a result of Plaintiff's complaints. (Dkt. 189-6 at 52).

On May 10, 2012, Searle sent an email to Andrea Gray in the Canandaigua VA's human resources department in which he explained that he had received numerous staff complaints regarding Plaintiff's insistence that Catholic veterans not be allowed to attend protestant services, even if the veterans asked to do so, and that they be required to attend Catholic services. (Dkt. 189-4 at 45). Searle noted that there had been an incident in which Plaintiff had taken a veteran who was a convicted pedophile to a community Mass where children were present, in direct violation of the veteran's parole conditions. (*Id.*). Searle indicated that the staff had voiced reluctance to address the issue directly with Plaintiff because he "escalates so quickly in his tone[.]" (*Id.*). Searle noted that he was concerned that Plaintiff was potentially violating the veterans' right to religious freedom. (*Id.*).

On May 11, 2012, a meeting was held with Lind, Searle, Plaintiff, and other staff, to discuss the complaints against Plaintiff. (*Id.* at 47-48). Another meeting with Searle, Lind, and Plaintiff was held on May 17, 2018, at Plaintiff's request. (*Id.* at 50). In this meeting,

Plaintiff asserted that it was inappropriate for Searle to supervise him because Searle was not Catholic and stated that he needed at least a week's notice before any meeting with Searle. (*Id.*). In a contemporaneous memorandum, Lind recorded that Plaintiff had used inflammatory language and been argumentative throughout the meeting. (*Id.* at 51).

On May 18, 2012, Plaintiff contacted a counselor at the VA's Office of Resolution Management ("ORM") claiming discrimination based on religion and national origin. (Dkt. 189-6 at 16-19).

In early June 2012, Royal reported an incident to Lind and Searle in which a veteran was upset because Plaintiff had taken a protestant bulletin from him and thrown it in the trash. (Dkt. 189-4 at 57; Dkt. 189-7 at 160).

On June 21, 2012, Lind directed Plaintiff to attend a meeting and informed him that he was welcome to bring a union representative. (Dkt. 189-7 at 143). Plaintiff asked to reschedule the meeting and was told that he was required to attend. (*Id.*). Boylan, Lind, Plaintiff, and several union representatives were present at the meeting. (*Id.*). At the meeting, Plaintiff was informed that his removal from the VA was being proposed and that the final determination would be made by Craig Howard ("Howard"), the Director of the Canandaigua VA. (*Id.*). Plaintiff was given a written summary of the action being taken against him and was allowed to respond to the notice of proposed removal in writing. (Dkt. 189-4 at 62-65; Dkt. 189-7 at 96-97). VA police ultimately escorted Plaintiff from this meeting to gather his keys and personal effects and to leave the facility. (Dkt. 189-7 at 143).

Plaintiff was placed on paid administrative leave during the review of his proposed removal, during which time he was paid his regular salary as a part-time chaplain. (*Id.* at 18). On July 18, 2012, Howard issue a written notice of removal to Plaintiff, effective July 21, 2012. (Dkt. 189-4 at 72-73).

## C.  Post-Termination Events

After Plaintiff was terminated, the New York State Department of Labor (the "NYSDOL") submitted a form to the Canandaigua VA regarding Plaintiff's application for unemployment benefits. (Dkt. 189-7 at 108). Flick, who, like Plaintiff, is Catholic, completed the form, and listed the reasons Plaintiff had been terminated. (*Id.*). There is no evidence in the record that the VA was otherwise involved in the processing of Plaintiff's NYSDOL application for unemployment benefits.

Plaintiff also claims that he was denied continuation of his health insurance benefits, in violation of the Consolidated Omnibus Budget Reconciliation Act of 1988 ("COBRA"). The Court notes as a threshold matter that, as it has previously instructed Plaintiff, COBRA does not apply to federal employees. Instead, continuation of health insurance benefits for federal employees is governed by the Federal Employees Health Benefits Amendments Act, under which federal employees are entitled to Temporary Continuation of Coverage ("TCC"), which is similar to, but distinct from, the benefits available under COBRA.

Crouse testified that, to her knowledge, she gave Plaintiff all the information he needed to obtain continuation of his health insurance benefits. (*Id.* at 38). Sheila Jones ("Jones"), who is now the Director of Human Resources at the Canandaigua VA, has submitted a sworn affidavit explaining that TCC premiums are not paid for or contributed

to by the VA and that employees who wish to enroll for TCC must affirmatively complete an application. (*Id.* at 126). The VA does not approve or deny requests for TCC; instead, it merely processes applications received from separating employees. (*Id.* at 127). Emails exchanged between Plaintiff and Crouse in August 2012 confirm that Plaintiff was told what forms he needed to complete if he wished to continue his health insurance benefits. (Dkt. 189-4 at 112). There is no record that Plaintiff ever submitted an application for TCC benefits to the VA. (*Id.*).

In September 2012, John Batten ("Batten") sent an email to Plaintiff asking him if he was still interested in the vacant full-time Catholic chaplain position at the Canandaigua VA. (Dkt. 183-4 at ¶ 211). Batten is employed as a program analyst at the VA National Chaplain Center in Hampton, Virginia, and was unaware that Plaintiff had filed an employment discrimination complaint. (Dkt. 189-7 at 2-6). After contacting Plaintiff, Batten learned that Plaintiff's ecclesiastical endorsement had been cancelled, rendering Plaintiff ineligible for chaplain positions at the VA. (*Id.* at 5).

## II.    **Procedural History**

This matter has a long and fairly complicated procedural history, which is summarized here only to the extent necessary.

Plaintiff filed a formal discrimination complaint on August 4, 2012, alleging discrimination based on national origin and religion, as well as retaliation. (Dkt. 189-6 at 21-43). On July 16, 2013, the VA's Office of Employment Discrimination Complaint Adjudication ("OEDCA") issued a Final Agency Decision finding that Plaintiff had not

demonstrated that he was discriminated or retaliated against. (*Id.* at 46-71).[4] The Final Agency Decision specifically informed Plaintiff that with respect to Claim 8 (his claim regarding his removal from the VA), his complaint is a "mixed case" and either an appeal with the Merit Systems Protection Board or a civil action in the appropriate United States district court must be filed within 30 days. (*Id.* at 70). With respect to Plaintiff's other claims, the Final Agency Decision informed Plaintiff that he could file a civil action within 90 days. (*Id.* at 69).

Plaintiff commenced the instant action on October 15, 2013. (Dkt. 1). Plaintiff initially named as defendants a number of individuals and the Canandaigua VA. (*Id.*). On September 29, 2014, the Court entered a Decision and Order dismissing several of Plaintiff's claims and substituting the Secretary of the VA as the sole defendant as to all remaining claims. (Dkt. 58).

---

[4] "[T]he Second Circuit has held that the findings of an administrative agency resulting from an investigation made pursuant to authority granted by law are generally admissible under the public records exception to the hearsay rule, unless the sources of information or other circumstances indicate lack of trustworthiness." *Lovejoy-Wilson v. Noco Motor Fuels, Inc.*, 242 F. Supp. 2d 236, 242 (W.D.N.Y. 2003) (quotation omitted). "The consideration, if any, to be given to [agency] findings is within the sound discretion of the trial judge." *Green v. Harris Publ'ns, Inc.*, 331 F. Supp. 2d 180, 191 (S.D.N.Y. 2004) (discussing findings made by the Equal Employment Opportunity Commission ("EEOC")). "However, 'the EEOC's findings are ordinarily entitled to great weight[.]'" *Edmonston v. MGM Grand Air, Inc.*, 808 F. Supp 197, 201 (E.D.N.Y. 1992) (quoting *Weise v. Syracuse Univ.*, 552 F.2d 397, 413 (2d Cir. 1975)).

On January 21, 2015, the Court entered a Decision and Order permitting Plaintiff to file an amended complaint, with certain restrictions. (Dkt. 77). Plaintiff's Amended Complaint, the operative pleading in this matter, was filed on January 22, 2015. (Dkt. 78).

Discovery in this matter closed on January 30, 2018. (Dkt. 180). Plaintiff filed his motion for summary judgment on March 23, 2018 (Dkt. 183), and Defendant filed his opposition to Plaintiff's motion and his own motion for summary judgment on April 27, 2018 (Dkt. 189). Plaintiff filed opposition papers on both June 18, 2018, and July 2, 2018. (Dkt. 194; Dkt. 195; Dkt. 198). Defendant filed reply papers on July 25, 2018 (Dkt. 200), and Plaintiff filed sur-reply papers on August 6, 2018 (Dkt. 201).

On February 25, 2019, Plaintiff filed a motion for "release of court decisions on motions for summary judgment." (Dkt. 206).

## DISCUSSION

### I.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d

Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.     Plaintiff's Motion for "Release of Court Decisions on Motions for Summary Judgment"

As an initial matter, the Court notes that on February 25, 2019, Plaintiff filed a motion for "release of court decisions on motions for summary judgment." (Dkt. 206). Plaintiff asserts therein that "[n]o Pro Se case has been allowed to stay this long in the judicial history of the United States." (*Id.* at 1). In light of Plaintiff's history of repeatedly asserting wrongdoing on the part of the Court and opposing counsel (*see, e.g.*, Dkt. 63; Dkt.

- 15 -

68; Dkt. 71), the Court finds it appropriate to briefly address Plaintiff's apparent assertion that his case has been impermissibly or inappropriately delayed.

First, Plaintiff's statement that his is the longest-standing *pro se* case in the "judicial history of the United States" is false. There are numerous *pro se* cases pending in this Court and in district courts across the nation that were commenced prior to Plaintiff's action.

Second, it is Plaintiff's own litigation conduct that has caused this matter to take longer than a typical case. From the beginning of this matter, Plaintiff has insisted upon filing "duplicative, voluminous, and meritless motions." (Dkt. 77 at 21; *see also* Dkt. 87 at 2-3 (noting Plaintiff's "practice of filing seriatim meritless motions")). Plaintiff continued this behavior throughout the case, in spite of repeated warnings by the Court. Plaintiff further engaged in discovery misconduct, resulting in the imposition of sanctions against him (*see* Dkt. 169) and disobeyed the Court's orders regarding filing seriatim summary judgment motions (*see* Dkt. 144; Dkt. 163; Dkt. 174; Dkt. 178). Plaintiff also refused to accept the Court's repeated explanations that his consent was not required for the matter to be referred to a magistrate judge for supervision of non-dispositive pre-trial matters. (*See* Dkt. 140 at 2). Despite Plaintiff's conduct, at all times the Court has given due and appropriate consideration to the motions filed by Plaintiff and has issued decisions as expeditiously as possible in light of the Court's heavy criminal and civil caseload. Any suggestion by Plaintiff to the contrary is without basis.

To the extent Plaintiff seeks affirmative relief in his motion for "release of court decisions on motions for summary judgment," his request has been mooted by the instant Decision and Order, which resolves all outstanding issues in this case. Accordingly,

Plaintiff's motion for "release of court decisions on motions for summary judgment" is denied.

### III.    Claims Already Dismissed by the Court

The Court notes that Plaintiff purports to seek summary judgment as to claims already dismissed in prior court orders. In particular, Plaintiff makes numerous arguments related to his termination from the VA. (*See, e.g.*, Dkt. 183-3 at 7-9). In a Decision and Order dated September 29, 2014 (Dkt. 58), this Court determined that Plaintiff had failed to administratively exhaust his wrongful discharge claim within the statutorily required time frame and dismissed Plaintiff's claim to the extent it was based on his termination (*id.* at 30-32). To the extent that Plaintiff's summary judgment motion seeks reconsideration of this ruling, it is denied. Plaintiff has failed to present any admissible evidence calling into question the Court's prior ruling or to otherwise demonstrate that the Court's ruling should be revisited. As such, to the extent Plaintiff's motion for summary judgment can be read as requesting reconsideration of the Court's dismissal of his wrongful discharge claim, it is denied.

Plaintiff's summary judgment motion also appears to challenge the Court's prior decision denying his request to join the Archdiocese for Military Services as a Defendant in this matter. (*See* Dkt. 140). Again, Plaintiff has failed to set forth any plausible reason that the Court's prior ruling in this regard should be disturbed and any request to that effect by him is denied.

## IV.    Plaintiff's Title VII Claims

Plaintiff has asserted numerous claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").   "Title VII prohibits employment-related discrimination on the basis of race, color, religion, sex, or national origin and retaliation against employees who complain about discrimination.  In 1972, Congress extended Title VII's protection to employees of the federal government[.]" *Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008).   Title VII is "the exclusive remedy available to federal employees who allege employment discrimination." *Wilder v. U. S. Dep't of Veterans Affairs*, 175 F. Supp. 3d 82, 88 (S.D.N.Y. 2016) (quotation omitted).

### A.    Failure to Timely Exhaust Administrative Remedies

"Prior to bringing suit under Title VII, a federal government employee must timely exhaust the administrative remedies at his disposal." *Mathirampuzha*, 548 F.3d at 74 (quotation and alterations omitted).  As one court in this Circuit has recently explained, the Equal Employment Opportunity Commission's ("EEOC") regulations require that prior to filing a lawsuit a federal employee:

> (1) consult with a counselor at the relevant agency's Equal Employment Office ("EEO") within 45 days of the alleged discriminatory act, and, if the matter is not resolved after a mandatory counseling period,

> (2) file a formal written administrative complaint ("EEO complaint") within 15 days of receipt of the EEO counselor's notice of final interview and right to file a formal complaint ("EEO notice").

> The employee may then file a civil action (i) within 90 days of notice of a final agency decision on his or her EEO complaint, or (ii) after 180 days from the filing of the EEO complaint if the agency has not yet rendered a decision.

- 18 -

*Wilder*, 175 F. Supp. 3d at 88-89. An EEO complaint filed more than 45 days after the alleged discriminatory act is untimely. *Id.* at 89.

In this case, Plaintiff made initial contact with the VA's Office of Resolution Management on May 18, 2012. (Dkt. 189-6 at 12). As such, for any acts of discrimination that occurred more than 45 days before May 18, 2012 (that is, before April 3, 2012), Plaintiff failed to timely exhaust his administrative remedies. Moreover, Plaintiff has not shown that this deadline should be equitably tolled. *See Wilder*, 175 F. Supp. 3d at 89-90 (equitable tolling of the 45-day deadline is warranted only in "a limited number of cases" where "extraordinary circumstances exist," and "the burden of demonstrating the appropriateness of equitable tolling lies with the plaintiff" (quotations and alteration omitted)).

Accordingly, Plaintiff cannot pursue any claims based on actions that occurred prior to April 3, 2012. In particular, Plaintiff cannot pursue any claims based on the initial payroll errors that occurred in 2011 and that were discovered at the latest by February 2012. Plaintiff also cannot pursue any claims based on his November 2011 performance appraisal. Defendants' motion for summary judgment is granted with respect to these claims.

### B.    Disparate Treatment Claims

Plaintiff has alleged various claims of disparate treatment during the course of his employment at the Canandaigua VA. In particular, the following claims of discriminatory disparate treatment remain in this action: (1) Plaintiff claims that he was wrongfully required to track his work hours on a sign-in sheet; (2) Plaintiff claims that his request for a waiver of indebtedness was denied for discriminatory reasons; (3) Plaintiff claims that he

was overcharged for health benefits between March 2012 and July 2012 because he was a full-time employee; (4) Plaintiff claims that he did not received paystubs for approximately one year and that when he did receive copies some were blank; (5) Plaintiff claims that he did not receive full-time tuition benefits; (6) Plaintiff claims that he did not receive a performance evaluation in June 2012; (7) Plaintiff claims that his supervisors interfered with his performance of his job duties in a variety of ways, including by wrongfully ordering him to return keys to the facility engineer and taking no action after he reported the incidents with Moeller; (8) Plaintiff claims that he was wrongfully asked to attend a meeting in May 2012 to discuss his performance issues; (9) Plaintiff claims that he was discriminated against in not being promoted to a full-time position when Smith-Soucier left the VA in March 2012 and in subsequently not being hired for the full-time chaplain position in September 2012; (10) Plaintiff claims that he was discriminated against by being asked to attend a meeting regarding his proposed removal on June 21, 2012; (11) Plaintiff claims that Defendant wrongfully interfered in his receipt of unemployment benefits from New York State; (12) Plaintiff claims that Defendant wrongfully denied him continued health insurance benefits; and (13) Plaintiff claims that he was discriminated against when Searle spoke to Father Condon. (*See* Dkt. 183-4). Plaintiff seeks summary judgment with respect to each of these claims, while Defendant opposes Plaintiff's motion and seeks summary judgment in his favor.

"At the summary-judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny."

*Mathirampuzha*, 548 F.3d at 78.

> At the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden of establishing a *prima facie* case of discrimination by showing that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

*Id.* (quotation omitted). Once the plaintiff has established a *prima facie* case:

> [T]he burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for the action. If the employer meets its burden of production, the inference of discrimination raised by the prima facie case then drops out and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is merely a pretext for discrimination.

*Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 316-17 (2d Cir. 1999) (citation omitted).

In this case, there is no dispute that Plaintiff belonged to a protected class. Nor, for purposes of the instant motions, has Defendant argued that Plaintiff was not qualified for the position of chaplain. Accordingly, the Court has focused its analysis on (1) whether Plaintiff experienced an adverse employment action and (2) whether any such adverse employment action occurred under circumstances giving rise to an inference of discrimination.

### 1. Adverse Employment Actions

Under Title VII, "adverse employment action" is defined as a "materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Sanders v. N.Y.C. Human Res.*

*Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quotations omitted). Examples of an adverse employment action include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities[.]" *Id.* (quotation omitted). In this case, the majority of the adverse actions claimed by Plaintiff do not rise to this level. In particular, and for the reasons discussed below, the Court finds that the only cognizable adverse employment actions are Plaintiff's claims that his request for a waiver of indebtedness was denied, that he was not promoted to a full-time chaplain in March 2012, that he was not selected for the full-time chaplain position in May and September 2012, that he did not receive a performance evaluation in June 2012, and that he was denied health insurance benefits.

### a.   Requirement that Plaintiff Track his Work Hours

Requiring an employee to sign in and out of work is not an adverse employment action. *See Lee v. N.Y. State Dep't of Health*, Nos. 98Civ.5712(RMB)(HBP), 99Civ.4859(RMB)(HBP), 2001 WL 34031217, at *17 (S.D.N.Y. Apr. 23, 2001) ("[W]ith respect to plaintiff's time sheets, plaintiff has failed to establish how the monitoring of an employee's hours and their corresponding submissions requesting payment for those hours, constitutes adverse employment action."). Defendants have submitted, and Plaintiff has failed to rebut, competent evidence showing that part-time chaplains at the Canandaigua VA were required to utilize time sheets. This was a standard part of Plaintiff's employment, not a deviation from it.

**b.**   **Claim that Plaintiff did not Receive Paystubs**

Plaintiff's claim that he did not receive paystubs for almost a year and that when he did receive paystubs some were blank is unsupported by the evidence of record, and a reasonable jury could not find that this constituted an adverse employment action. Even accepting Plaintiff's claim that he did not receive a paper copy of his earnings statement (a fact which is supported only by Plaintiff's own unsubstantiated claims), Christensen testified, and Plaintiff has failed to point to any evidence to rebut, that Plaintiff had access to a computerized version of his earnings statements throughout his employment. (Dkt. 189-7 at 19). Not receiving an earnings statement in his preferred form does not constitute an adverse employment action that materially altered the terms and conditions of Plaintiff's employment.

**c.**   **Claim that Plaintiff did not Receive Tuition Benefits and was Overcharged for Health Benefits**

Plaintiff's claims that he was denied tuition benefits and overcharged for health benefits are unsupported by the record. The crux of these claims is that Plaintiff believes he became a full-time employee of the VA in March 2012 and was therefore entitled to the benefits a full-time employee would receive. The record conclusively demonstrates that Plaintiff's belief is incorrect. Plaintiff did not become a full-time VA employee in March 2012. As Defendant has amply demonstrated, and Plaintiff has failed to rebut, VA policy did not permit Plaintiff's promotion to a full-time position without first posting the opening and seeking other potential candidates. Defendant has also produced evidence, unrebutted

by Plaintiff, that it was standard procedure for a part-time employee to take on additional hours to provide additional coverage.

The only evidence Plaintiff has for his claim that he was made full-time in March 2012 are his own unsubstantiated statements. A plaintiff's "unsubstantiated and self-serving testimony is insufficient, without more, to defeat summary judgment." *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 326 (S.D.N.Y. 2015); *see also Ne. Research, LLC v. One Shipwrecked Vessel*, 729 F.3d 197, 213-14 (2d Cir. 2013) (conclusory, unsubstantiated allegations are insufficient to defeat a motion for summary judgment). A rational jury could not conclude on the record before the Court that Plaintiff became a full-time VA employee, and therefore also could not conclude that Plaintiff was wrongly denied the tuition and health insurance benefits to which a full-time employee was entitled.

### d. Claims Regarding Supervision and Job Duties

Plaintiff has a litany of complaints about the manner in which he was supervised during his VA employment. In particular, Plaintiff claims that he was required to work with volunteers who provided services to Catholic patients, that he was required to change a meeting location from a conference room to his office, that he was requested to turn over particular keys, that he was asked to attend various meetings regarding his work performance, that Searle reassigned some of his duties, and that he was not provided training. (*See* Dkt. 183-4 at ¶¶ 119-65). None of these actions, considered individually or as a whole, rises to the level of an adverse employment action.

"[E]veryday workplace grievances, disappointments, and setbacks" such as location changes are not adverse employment actions for purposes of a Title VII discrimination claim. *Cunningham v. N.Y. State Dep't of Labor*, 326 F. App'x 617, 619 (2d Cir. 2009) (finding that reassignment of the plaintiff's office space did not constitute an adverse employment action). Courts have also found that taking away an employee's keys does not constitute an adverse employment action. *See, e.g., Colon v. Fashion Inst. of Tech. (State Univ. of N.Y.)*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (taking away an employee's bathroom keys was not an adverse employment action).[5]

Plaintiff also does not dispute that it was standard VA practice to utilize volunteers and has proffered no plausible explanation for how requiring him to work with volunteers potentially constituted an adverse employment action. The fact that Plaintiff had theological differences and disagreements with VA volunteers is the sort of interpersonal issue that exists in every workplace and does not constitute an adverse employment action.

With respect to the specific issue of Plaintiff's interaction with Moeller, although Plaintiff makes the unsubstantiated claim that nothing was done about his complaints, the evidence of record shows that Searle in fact investigated the claim, consulted with Flick, and spoke to Moeller and told him that his actions were inappropriate. (Dkt. 189-6 at 51-52). Contemporaneous email records show that Searle informed Plaintiff that he had

---

[5]     The record in this case does not support the conclusion that Plaintiff's keys were ever taken from him, as opposed to Plaintiff having been requested to turn over keys and, when he protested, alternative arrangements having been made. As such, Plaintiff's claim of an adverse employment action is even weaker than in cases where keys were actually confiscated.

spoken to Moeller on April 10, 2012, approximately nine days after the incident originally occurred, and approximately one week after Moeller's name was given to Searle, and that the situation had been resolved. (Dkt. 189-4 at 98). Plaintiff's claim that Moeller had grabbed his arm on May 6, 2012, was also investigated, and Plaintiff and Moeller were separated from working together as a result. (Dkt. 189-6 at 52). Accordingly, there is no basis to conclude that Plaintiff was wrongfully forced to work with a volunteer who had mistreated him, so as to constitute an adverse employment action.

Searle's reassignment of some of Plaintiff's duties to himself in order to ease Plaintiff's workload also does not constitute an adverse employment action. In order to sustain this claim, Plaintiff must demonstrate that this reassignment of duties resulted in "significantly diminished material responsibilities." *Abboud v. Cty. of Onondaga, N.Y.*, 341 F. Supp. 3d 164, 179 (N.D.N.Y. 2018) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006)). No evidence to support such a finding exists in the record before the Court.

Turning to Plaintiff's allegation that he was denied training, inadequate training may constitute an adverse employment action, "but only in circumstances where an employer denies necessary job training to an employee and the terms and conditions of his employment are thereby harmed." *Carpenter v. City of Mount Vernon*, 198 F. Supp. 3d 272, 279-80 (S.D.N.Y. 2016). Allegations of a denial of training that are "vague and unsupported" are insufficient to defeat a motion for summary judgment. *Rodriguez v. Long Island Am. Water, Inc.*, No. 12-cv-2970(JFB)(ARL), 2014 WL 4805021, at *14 (E.D.N.Y. Sept. 26, 2014). Moreover, "[w]hen an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there

is no adverse employment action." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006). In this case, the evidence of record shows that Plaintiff received basic chaplain orientation training and that Plaintiff's request for hospice training was approved by Searle. (Dkt. 189-7 at 179, 190). Plaintiff has failed to produce or identify any evidence to support the conclusion that he was denied necessary job training.

### e. Claims Regarding Meetings to Discuss Performance

Being required to attend meetings to discuss performance issues is not an adverse employment action. "Criticism of an employee in the course of evaluating and correcting her work is not, in itself, a materially adverse employment action." *Dimitracopoulos v. City of N.Y.*, 26 F. Supp. 3d 200, 214 (E.D.N.Y. 2014) (citing *Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001)). "A thin-skinned worker's reaction to criticism by a supervisor will not support a claim of . . . discrimination unless it is outside the bounds of appropriate supervision[.]" *Id.* Here, it is well-documented that numerous complaints and performance issues had been raised with respect to Plaintiff, and it was not out of bounds for Plaintiff's supervisors to attempt to meet with him to discuss these issues. While Plaintiff may have been offended by his supervisors' attempts to meet with him, those meetings did not constitute adverse employment actions.

### f. Claim that Searle Met with Father Condon

Searle's meeting with Father Condon of the Catholic diocese of Rochester does not constitute an adverse employment action.[6] Plaintiff's speculation that this meeting was

---

[6] Nor, as Plaintiff seems to assert, does it constitute a violation of his First Amendment rights. There is no evidence in the record that Searle's conversation with Father Condon

evidence of some conspiracy to remove him from the VA is wholly unsupported by the record. Searle was Plaintiff's supervisor and was performing due diligence regarding complaints against Plaintiff. It was a proper part of that supervision for Searle to have a conversation with a former employer of Plaintiff.

### 2. Inference of Discrimination

The Court further finds that Plaintiff has not established that any adverse employment action in this case occurred under circumstances giving rise to an inference of discrimination.

> Inference of discrimination is a flexible standard that can be satisfied differently in differing factual scenarios. . . . An inference of discrimination can be drawn from circumstances such as the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's adverse employment action, or by showing that an employer treated an employee less favorably than a similarly situated employee outside his protected group.

*Brown v. Xerox Corp.*, 170 F. Supp. 3d 518, 532 (W.D.N.Y. 2016) (quotation and original alterations omitted).

As an initial matter, the Court notes that the mere fact that Plaintiff and the VA decision makers at issue are of different religions and national origins does not, by itself, demonstrate an inference of discrimination. *See, e.g., Johnson v. City of N.Y.*, 669 F. Supp.

---

had anything to do with Plaintiff's religious beliefs, as opposed to Plaintiff's conduct during the course of his employment. The evidence of record shows that Searle met with Father Condon solely to inquire as to Plaintiff's conduct in a prior place of employment and not for any religiously-based reason. It is not a violation of the First Amendment for a governmental employer to speak to a former employer.

2d 444, 450 (S.D.N.Y. 2009) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 71 (2d Cir. 1994)));

*Holdmeyer v. Veneman*, 321 F. Supp. 2d 374, 382 (D. Conn. 2004), *aff'd sub nom.*

*Holdmeyer v. Dep't of Agric.*, 146 F. App'x 535 (2d Cir. 2005). Plaintiff's repeated

arguments to the contrary are without merit. (*See, e.g.*, Dkt. 183-3 at 17 (arguing Plaintiff

has shown discrimination because "[a]ll who discriminated against this Plaintiff are

Protestants and are American born but Plaintiff is Catholic, an American citizen but not

born in America"); Dkt. 189-7 at 56-57 (at deposition, when asked why he thought that

Searle and Lind had discriminated against him on the basis of his religion, Plaintiff stated

that it was because they were not Catholic and "you know what goes between Protestants

and Catholics"); *id.* at 58 (when asked for evidence that Searle and Lind discriminated

against him on the basis of his national origin, Plaintiff stated "[b]ecause they were not born

in Nigeria")).

Nor are there any other circumstances in this case that support an inference of

discrimination. Plaintiff has identified a single interaction during the course of his VA

employment that involved a protected characteristic—his claim that Moeller told him that

he hated his accent and the way he talked. While this statement is inappropriate and

insensitive, Moeller was not a decision maker at the VA, but was merely a volunteer. There

is no evidence that Moeller had any impact whatsoever on any of the actions Defendant

took with respect to Plaintiff's employment. *See Sanderson v. N.Y. State Elec. & Gas

Corp.*, 560 F. App'x 88, 93 (2d Cir. 2014) (finding no inference of discrimination where

the plaintiff failed to produce any evidence showing that the individuals who harassed her

"played any role in the decision to terminate her employment"); *Rightnour v. Tiffany & Co.*,

354 F. Supp. 3d 511, 522 (S.D.N.Y. 2019) (finding no inference of religious discrimination where there was "no evidence that any of the decision-makers harbored religious animus ... against Catholics"). Moreover, Plaintiff testified at his deposition that he had never heard Searle or any of the other involved VA decision makers express animosity based on his religion or national origin. (Dkt. 189-7 at 87-88).

There is also no evidence that Plaintiff was treated differently from similarly situated employees of different races, religions, or national origins. The sole concrete claim Plaintiff makes in this regard is that he was the only chaplain who was required to sign in on a time sheet. However, this assertion is unsubstantiated and flatly contradicted by the evidence of record. Multiple VA employees with personal knowledge, including Searle himself, confirmed that Searle was required to sign in when he was a part time chaplain. (*See* Dkt. 189-7 at 132, 174). Moreover, Lind identified five other part-time chaplains who were required to sign in (*id.* at 132), and Defendant produced sample sign-in sheets corroborating this testimony (Dkt. 189-4 at 75-76). Plaintiff's mistaken belief that he was singled out and required to track his hours is not evidence of discriminatory conduct.

Considering the specific adverse employment actions alleged by Plaintiff, there is no evidence whatsoever that the Waiver Committee, which was responsible for the denial of Plaintiff's request for a waiver of indebtedness, was motivated by any impermissible consideration. To the contrary, there is no indication that the members of the Waiver Committee were even aware of Plaintiff's religion or national origin. Dawson, Christensen, and Howard, the Canandaigua VA employees who were familiar with Plaintiff, actively

assisted him in trying to get his debt waived. That they were ultimately unsuccessful is not evidence of discriminatory intent.

There is also no evidence that Plaintiff was not promoted to a full-time position in March 2012 as a result of discrimination. The evidence of record is clear that the VA's human resources procedure required that the position be approved and posted and that it could not simply be given to Plaintiff. (*See, e.g.*, Dkt. 189-7 at 35, 135). The fact that VA employees complied with standard VA policies in filling the position vacated by Smith-Soucier is not evidence of unlawful discrimination.

The decision not to hire Plaintiff for the full-time chaplain position in May 2012 and the failure to provide a performance evaluation in June 2012 also did not occur under circumstances giving rise to an inference of discrimination. There is no evidence whatsoever in the record suggesting that the decision makers with respect to these decisions were motivated by Plaintiff's religion or national origin. To the contrary, the record is clear that Plaintiff was not given a performance evaluation in June 2012 because the decision to recommend removal had already been set in motion, and performance evaluations were not given in such circumstances. (*See* Dkt. 189-7 at 103). It is further clear that Plaintiff was not hired for the full-time chaplain position in May 2012 because of the numerous complaints that had been lodged against him and his documented performance issues, including his refusal to attend the May 4th meeting. Again, Plaintiff has produced no evidence whatsoever to suggest that these actions were taken as a result of his religion or national origin.

Plaintiff also has not produced evidence from which a rational jury could conclude that he was denied continuation of health insurance benefits for discriminatory reasons. Crouse testified that, to her knowledge, she had given Plaintiff all the information he needed to apply for TCC, and that he was provided contact information if he had further questions. (Dkt.189-7 at 38). Moreover and more importantly, as Jones explained, the VA does not approve or deny TCC benefits. It can only process applications and there is no evidence that Plaintiff ever submitted an application. (*Id.* at 126-27).

Finally, there is no evidence that Plaintiff was not hired for the full-time chaplain position in September 2012 as a result of unlawful discrimination. To the contrary, it is undisputed that at that point in time, Plaintiff's ecclesiastical endorsement had been cancelled, rendering Plaintiff ineligible for chaplain positions at the VA. (*Id.* at 5).

In sum, there is no evidence in the record from which a rational jury could conclude that any adverse employment action against Plaintiff took place under circumstances giving rise to an inference of discrimination. Plaintiff therefore cannot satisfy the requirements of a *prima facie* claim of disparate treatment under Title VII, and Defendant is entitled to summary judgment with respect to these claims.

## C.    Hostile Work Environment Claim

[T]o prevail on a hostile work environment claim under Title VII, a plaintiff must make a prima facie showing that [his] workplace was permeated with "discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and show a specific basis for imputing the conduct that created the hostile work environment to [his] employer.

*McCullough v. Xerox Corp.*, 942 F. Supp. 2d 380, 385 (W.D.N.Y. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "The test for hostile work environment has both an objective and a subjective component: A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004) (quotation omitted).

> Whether a reasonable person would find a given work environment to be hostile depends on the totality of the circumstances; considerations include: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance.

*Id.* (quotation omitted). Summary judgment on a hostile work environment claim is appropriate if the Court concludes "as a matter of law that no rational juror could view [the defendant's conduct] as . . . an intolerable alteration of [the plaintiff's] working conditions." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 75 (2d Cir. 2001) (quotation omitted and alterations in original).

A hostile work environment claim is "a wholly separate cause of action designed to address other types of *work place* behavior [than discriminatory adverse employment actions], like constant jokes and ridicule or physical intimidation." *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 648 (W.D.N.Y. 2014) (quotation omitted). Importantly, Title VII is "not a general civility code," *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999), and "[w]ork environments that are hostile for non-discriminatory reasons do not fall within

the ambit of Title VII," *DeLaurencio v. Brooklyn Children's Ctr., Superintendent*, 111 F. Supp. 3d 239, 248-49 (E.D.N.Y. 2015) (quotation omitted).

On the record before the Court in this case, no rational jury could find that Plaintiff was subjected to a hostile work environment based on a protected characteristic. The sole factual allegation that has any relationship to any protected characteristic of Plaintiff's is that on April 1, 2012, Moeller told Plaintiff that he hated his accent and the way he talked. "Isolated incidents or episodic conduct will not support a hostile work environment claim." *Richardson v. N.Y. State Dep't Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999), *abrogated on other grounds by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Plaintiff's two interactions with Moeller, only one of which involved the use of inappropriate language, simply do not rise to the level of a hostile work environment.

None of the other allegedly hostile incidents identified by Plaintiff in this case have any relation to a protected characteristic. "While facially neutral incidents may be considered among the totality of the circumstances in any hostile work environment claim, there must be a circumstantial or other basis for inferring that incidents []neutral on their face were in fact discriminatory." *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (quotations and original alteration omitted). No such basis exists in this case. As the Court explained above, when asked to identify evidence for his claims of discrimination, Plaintiff merely reiterated over and over again that the other employees of whom he complained were of different races, religions, and national origin than him. This is not evidence of discriminatory intent. Moreover, the evidence of record shows that Plaintiff's supervisors investigated and took action with respect to Plaintiff's complaints

regarding Moeller, again undercutting any inference of discrimination. Accordingly, the Court finds that Defendant is entitled to summary judgment with respect to Plaintiff's hostile work environment claim.

### D. Retaliation Claim

Plaintiff also asserts a Title VII retaliation claim. Title VII contains an anti-retaliation provision that makes it unlawful "'for an employer to discriminate against any . . . employee[] or applicant[] . . . because [that individual] opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII investigation or proceeding." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (alterations in original) (quoting 42 U.S.C. § 2000e-2(a)). Retaliation claims are evaluated pursuant to a three-step burden-shifting analysis. *Id.* First, the plaintiff must establish a *prima facie* case by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* "The plaintiff's burden in this regard is *de minimis*, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.* (quotation omitted).

If the plaintiff sustains his initial burden, a presumption of retaliation arises and the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (quotation omitted). If the defendant can do so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (quotation omitted). "A plaintiff can sustain

[that] burden by proving that a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[.]" *Id.* (quotation omitted).

Actions are "materially adverse" for purposes of a retaliation claim if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 165 (quoting *Burlington*, 548 U.S. at 57). The Second Circuit has held that "petty slights or minor annoyances" are not materially adverse for purposes of a Title VII retaliation claim. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24-25 (2d Cir. 2014). When deciding a summary judgment motion as to a Title VII retaliation claim, in addition to considering alleged acts of retaliation on their own, courts must consider them in the aggregate, "as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 225 (E.D.N.Y. 2014) (quoting *Hicks*, 593 F.3d at 165).

In this case, Plaintiff has identified the following actions as purportedly having been undertaken in retaliation for his filing of an EEO complaint on May 8, 2012: (1) denial of Plaintiff's application for the full-time chaplain position in May 2012; (2) Plaintiff's termination; and (3) the purported failure to provide Plaintiff with information regarding continuation of his health insurance. (Dkt. 183-3 at 20-22). As a threshold matter, the Court notes that it has already dismissed Plaintiff's claims related to his termination for failure to administratively exhaust, which encompasses any claim that Plaintiff's termination was retaliatory. Accordingly, Plaintiff's retaliation claim cannot proceed on the theory that he was terminated as a result of his discrimination complaint.

With respect to the other allegedly retaliatory actions taken by Defendant, the Court finds that there is no support in the record for Plaintiff's assertion that he was wrongfully denied the opportunity to continue his health insurance benefits after his termination. As discussed above, the evidence of record shows that Plaintiff was given the forms he needed to complete and that he failed to submit an application. Defendant cannot be faulted for not processing a TCC application that was never submitted. Accordingly, Plaintiff cannot show any causal relationship between his protected activity and his alleged failure to obtain TCC benefits.

Finally, there is no evidence that Plaintiff's application for the full-time chaplain position made in May 2012 was denied for retaliatory reasons. Even assuming that Plaintiff could state a *prima facie* case of retaliation with respect to this failure to promote him, Defendant has amply identified the legitimate, non-discriminatory reasons that Plaintiff was not hired. In particular, the numerous complaints that had been lodged against Plaintiff and his insubordination (specifically, in refusing to attend the May 4th meeting) are more than adequate rationale for the determination not to promote Plaintiff in May 2012. *See Diello v. Potter*, 697 F. Supp. 2d 410, 414 (W.D.N.Y. 2010), *aff'd*, 413 F. App'x 344 (2d Cir. 2011) (finding legitimate, non-discriminatory reasons for non-promotion where the plaintiff had an inadequate interview and reports of poor performance). Nothing in the record suggests that these concerns were pretextual; to the contrary, they are well-documented and arose from a variety of sources. Moreover, the concerns in question in significant part pre-dated Plaintiff's protected activity, and many of those involved were unaware that Plaintiff had filed a discrimination complaint. Under these circumstances, no rational jury could

find that Defendant retaliated against Plaintiff. Accordingly, the Court grants summary judgment to Defendant on Plaintiff's retaliation claim.

## CONCLUSION

For all the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. 183) is denied and Defendant's motion for summary judgment (Dkt. 189) is granted. Plaintiff's motion for "release of court decisions on motions for summary judgment" (Dkt. 206) is denied as moot. The Clerk of Court is directed to enter judgment in favor of Defendant and to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: March 29, 2019
      Rochester, New York